IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHRISTOPHER ANTHONY BLAKE,

                          Plaintiff,                              OPINION AND ORDER

          v.                                                         22-cv-632-wmc

CHERYL EPLETT, PAUL NINNEMANN,
BECKY BLODGETT, K. WIRTH, M. YOHR,
SHANNON TAYLOR, SGT. BUSTOS,
K. KACZMARCK, ROGERT GAGE, M.D.,
and CHRISTINE BURNETT,

                          Defendants.

Plaintiff Christopher Anthony Blake, representing himself, alleges that he contracted Covid-19 while incarcerated at Oakhill Correctional Institution after staff there refused to either remove five Covid-positive inmates from his housing unit in December 2020 *or* remove him. The court granted Blake leave to proceed on Eighth Amendment deliberate indifference claims against certain security and health services staff. (Dkt. #6.) Defendants now seek summary judgment on the merits of all of Blake's claims, and alternatively argue that they are entitled to qualified immunity. (Dkt. #19.) For the following reasons, the court will grant their motion and close this case.

UNDISPUTED FACTS[1]

---

[1] Unless otherwise indicated, the following facts are material and undisputed when viewed in a light most favorable to plaintiff, despite his failing to respond to defendants' proposed findings of fact as required by the court's summary judgment procedures. *See Miller v. Gonzalez*, 761 F.3d 822, 877 (7th Cir. 2014) ("We must . . . construe the record in the light most favorable to the nonmovant and avoid the temptation to decide which party's version of the facts is more likely true."). The court has therefore generally accepted defendants' proposed findings of fact as undisputed, so long as they are supported by admissible evidence. But to account for the fact that plaintiff is not

## A. Background

Plaintiff Blake suffers from eosinophilic granulomatosis with polyangiitis ("EGPA"), a rare autoimmune disease that usually causes asthma, among other problems, and that Blake alleges makes him vulnerable to complications from Covid-19.[2]  He was incarcerated at Oakhill at all times relevant to this lawsuit.

Defendants similarly worked at Oakhill for the Wisconsin Department of Corrections ("DOC") during the same time period as follows:  Warden Cheryl Eplett; Deputy Warden Paul Ninneman; Security Director Rebecca Blodgett; Unit Manager Mya Yohr; Captains James Wirth and Kevin Kaczmarek; Sergeants Shannon Taylor and Andrew Bustos; Dr. Robert Gage; and Advanced Practice Registered Nurse Christine Burnett.

## B. The Covid-19 Response at Oakhill

For staff at Oakhill, the Covid-19 pandemic began in March 2020.  As a minimum-security prison, staff there faced numerous challenges during the early onset of the pandemic, as they worked to balance maintaining normal operations against preventing the spread of the Covid-19 virus within the institution.  In particular, Oakhill's leadership relied on the institution's health services unit ("HSU") and the DOC's Bureau of Health Services ("BHS") to develop policies and practices to mitigate the risks associated with Covid-19.  Throughout the pandemic, defendant Warden Eplett attests that she was in

---

represented by an attorney, the court has attempted to consider those facts he disputes where some credible evidence arguably supports it *or* he could reasonably have personal knowledge of it.

[2]  EGPA was previously called Churg-Strauss Syndrome.  *See* Churg-Strauss Syndrome, https://www.mayoclinic.org/diseases-conditions/churg-strauss-syndrome/symptoms-causes/syc-20353760

regular communication with the Oakhill HSU manager regarding information and guidance from BHS about how to respond to the virus, as well as with supervisors and department heads about the latest protocols and practices. Unit Manager Yohr was also involved in creating quarantine and isolation protocols for the units consistent with the guidelines received from Oakhill's leadership, the HSU and BHS.

Generally, Oakhill operates under an Incident Command Structure ("ICS"), which included Warden Eplett, Deputy Warden Ninnemann, Security Director Blodgett, and Captains Wirth and Kaczmarek, along with others as appropriate. Since the pandemic, this team has been charged with determining the best course of action based on the number of positive Covid-19 cases at any given time, and held weekly (and sometimes daily) meetings to review and address any new Covid-19 guidelines or related updates from the DOC. Oakhill leadership also took direction from the DOC's Emergency Operations Center, and DOC Wardens consulted with each other on a weekly basis regarding best practices for facility operations.

Throughout the pandemic, Oakhill leadership implemented a variety of practices to help slow the spread of the virus in light of the institution's physical layout and operational and security needs. Among other things, Oakhill promoted: hand washing and avoiding contact with one's eyes, nose, and mouth; covering one's mouth and nose when coughing or sneezing; keeping living and work areas clean; wearing a mask; and maintaining social distancing. Staff were also required to wear masks and to participate in entrance screenings. At times, Oakhill also suspended in-person visits, prevented volunteers from entering the institution, had cleaning crews clean and sanitize all areas of the institution

daily, limited all non-essential movement, reduced or suspended recreation, had inmates shower in smaller groups, sanitized the showers and phones between uses, provided additional soap and cleaning supplies, installed hand sanitizer stations, did temperature checks on inmates, and had HSU staff complete rounds offering temperature and symptom checks. When the vaccine became available, doses were also requested the following week.

Finally, Oakhill relied on isolating and quarantining inmates. Isolation status applied to inmates with a test-confirmed case of the virus, while quarantine status included those inmates who had been exposed to the virus, exhibited symptoms but not yet tested positive, or recently transferred into Oakhill. When necessary, Oakhill would even quarantine entire housing units.

### C. Oakhill's Covid-19 Response to the December 2020 Outbreak

When Blake contracted the virus in late December 2020, Oakhill housed on average 666 inmates across 15 housing units. Early in the month, the institution was able to quarantine symptomatic inmates in the restrictive housing unit as space allowed. The institution also quarantined the four housing units with positive cases. On December 7, Security Director Blodgett further sent a memo informing inmates that outdoor recreation was cancelled. Over the next few days, Warden Eplett and Blodgett sent additional memos and emails regarding modified operations at Oakhill.

Next, on December 14 and 15, the national guard tested all Oakhill inmates for Covid-19. When those results became available on December 17, Oakhill was determined to have 154 positive cases at the institution. Given this volume of positive cases, quarantining all test-confirmed positive inmates in the restrictive housing unit or anywhere

4

else within the institution became unfeasible.  This is because of the assumption that all inmates had been exposed to Covid-19 due to sustained close contact among inmates. More specifically, Warden Eplett concluded that:  many inmates who had tested negative during the first mass testing had since been exposed to Covid-19 positive cellmates and other inmates on their units; and moving inmates, even those who tested negative, could well spread the virus across the institution even further.  In consultation with the ICS team and with direction from BHS and the CDC, therefore, Eplett determined that neither active positive cases nor those potentially exposed could be moved.  Since the need for isolation or quarantine could not be achieved in light of the institution's space limitations, other than by requiring inmates to isolate or quarantine in place, Eplett then decided on December 17, 2020, after again consulting with the ICS team and directives from BHS, that the only effective way to isolate and quarantine was for inmates to "shelter in place." (Dkt. ##24 at ¶ 34; 26-4 at 1.)  Under this restriction, only essential movements were permitted, including for health care services, food service, maintenance and snow removal, court calls, law library for open cases, and academics through external educational institutions.  Outdoor recreation was also modified to allow for fresh air for Covid-negative inmates or recovered inmates.

During this difficult period, Blake maintains that five inmates on his housing unit had tested positive, but despite being aware of his medical condition, defendants would neither remove the Covid-positive inmates nor Blake from the housing unit.  Moreover, when the national guard retested all Oakhill inmates who had not previously tested positive on December 28, the results showed another 158 positive cases, including Blake.  Oakhill

5

did not loosen restrictions until mid-January when the number of positive cases began to drop.  Until then, staff, including Blake's unit manager Yohr, were not permitted to move inmates under the restrictions in place.  Regardless, there was insufficient space in which to move inmates in light of the sheer volume of ongoing positive cases for the reasons explained above.  Security Director Blodgett also attests that changing an inmate's cell assignment requires consideration of various factors in addition to inmate health, including security and mental health needs.  Further, neither Unit Manager Yohr nor Blodgett recall being informed of specific inmates testing positive for Covid-19 or of Blake's health condition specifically.  Indeed, unless there was a security issue or other, specific reason for either of them to know, both Yohr and Blodgett attest that they are *not* informed of an individual inmate's health conditions.

Blake filed an inmate complaint on December 28, 2020.  He asserted that medically vulnerable inmates who had been negative for the virus, like himself, were being housed with Covid-positive inmates.  Although the complaint was affirmed, the inmate complaint examiner and reviewing authority (Warden Eplett) both explained that quarantining in place was proper given that there was no way to hold all of the positive cases in separate housing and that the Covid-negative inmates had presumably been exposed to the virus so moving them would have risked spreading the virus.  (Dkt. #28-7 at 1, 3.)

### D.  Blake's Health Care Treatment

While Oakhill, Dr. Gage treated Blake for his breathing and other issues related to his EGPA.  Blake's treatment included various medications, antibiotics, steroids, and regular blood draws and laboratory tests.  Blake was also prescribed albuterol and an

inhaler, as well as access to a nebulizer in the HSU.  In late October 2020, Dr. Gage noted that Blake's EGPA seemed stable, and that Blake was doing well.

As a physician, Dr. Gage could recommend that a Covid-positive inmate remain in the HSU for closer monitoring if medically necessary, but this was not possible in every positive case given space restrictions, particularly when the Covid outbreak was at its worst. When Blake tested positive for Covid-19 on December 28, 2020, he was seen in the HSU by a nondefendant provider within two days.  Blake complained of muscle pain and a headache, but otherwise did not present any symptoms.  (Dkt. #27-1 at 2-4.)  On January 12, 2021, Blake sent a follow-up interview request to the HSU, asking when he could return to work, and he was told that the security director sent out a weekly list.  (*Id.* at 82.) Blake did *not* send any further health services requests complaining about any ongoing complications or symptoms from Covid-19.  (*See id.* at 79-83.)  Nor did Dr. Gage ever see him for any issues related to Covid-19.

Dr. Gage did see Blake on January 20, 2021, for his EGPA.  Blake again indicated that he was doing well overall, but was occasionally wheezing early in the morning and sometimes had trouble finding someone to take him to the HSU for nebulizer treatments. (*Id.* at 21-22.)  However, he did *not* complain about symptoms or complications from Covid-19.  As a result, Dr. Gage did not change Blake's medications, but rather noted that he had an order for an echocardiogram and a consult with rheumatology.  On February 3, 2021, Dr. Gage also sent Blake a letter reassuring him that his EGPA blood tests looked normal.  After the echocardiogram showed a mild decrease in Blake's systolic left ventricular function, Dr. Gage recommended that he be seen by cardiology for continued

long-term, follow-up treatment.  Blake continued to receive treatment for his EGPA from Dr. Gage until he left Oakhill in late 2021.

OPINION

Defendants seek summary judgment on plaintiff's Eighth Amendment claims that they each violated his constitutional rights by refusing to remove him (or the five Covid-positive inmates from his housing unit) despite knowing about his medical condition, and that as a result, he contracted the virus.  Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment.  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In deciding whether to grant summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.

Generally, a court generally construes the filings of unrepresented parties generously.  *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (noting that courts "construe pro se filings liberally").  However, summary judgment has been repeatedly referred to as the "put up or shut up" moment for parties seeking to take their claims to trial, at least in the Seventh Circuit.  *Johnson v. Cambridge Indus. Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted).  Specifically, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts"; he must

8

respond to defendants' showing of a lack of material disputes of fact by designating specific facts in affidavits, depositions, answers to interrogatories or admissions that establish there is a genuine triable issue.  *Anderson*, 477 U.S. at 256-57, 261.  And because those facts must be admissible at trial, plaintiff may not rely on inadmissible hearsay, speculation, or conclusory allegations to defeat summary judgment.  *See Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023); *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999).  Finally, a factual dispute can preclude summary judgment, but only if the facts "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

## I.  Lack of Personal Involvement

As a threshold matter, plaintiff has not offered sufficient evidence that Deputy Warden Ninnemann, Nurse Burnett, or Correctional Officers Wirth, Taylor, Kaczmarek, and Bustos were *personally* involved in the alleged constitutional violations here.  To be held liable for a constitutional violation under § 1983, a defendant must have been personally involved.  *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018).  At most, plaintiff conclusorily alleges in his complaint that these defendants "knew of his underlying medical condition," yet would not remove him or any Covid-positive inmate from his housing unit.  (Dkt. #1 at 2-3.)  However, plaintiff has never alleged any specific facts regarding the defendants' involvement (*see* dkt. #1), much less provided actual evidence of their individual involvement in responding to defendants' motion for summary judgment.  (*See* dkt. #28.)

As a result, the court is left to guess at what role, if any, they each played in the underlying events that he claims violated his constitutional rights.  Moreover, to the extent

some submitted exhibits may implicate any of these defendants, plaintiff does not explain how, nor will the court "scour the record looking for factual disputes" on plaintiff's behalf. *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). Finally, to the extent that any of these defendants may have refused a request from plaintiff to move him or other inmates from his unit, plaintiff points to *no* evidence that any of those ground level officers (or even the Deputy Warden or a nurse) had the authority to countermand Oakhill's movement restrictions put in place by the Warden at the time. Indeed, having purportedly been adopted after consulting HSU and DOC experts, there is nothing in the record to suggest, much less a reasonable jury to find, that any of these defendants had reason to suspect any movement of plaintiff or the five positive cases in his unit was more likely to benefit or harm him specifically *and* the overall prison population more generally. Because plaintiff has not established how Ninnemann, Burnett, Wirth, Taylor, Kaczmarek, and Bustos were personally involved in the underlying events of this case, these defendants are entitled to summary judgment on plaintiff's claims against them.

## II. Remaining Defendants

That leaves Warden Eplett, Security Director Blodgett, Unit Director Yohr, and Dr. Robert Gage. Plaintiff claims that the actions or inactions of these defendants violated his Eighth Amendment rights. The Eighth Amendment imposes a duty on prison officials to provide humane conditions of confinement and to ensure that reasonable measures are taken to guarantee inmate safety and prevent harm. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994). A prison official violates the Eighth Amendment if the official consciously disregards a substantial risk of serious harm to an inmate. *Balsewicz v. Pawlyk*, 963 F.3d

650, 654 (7th Cir. 2020).  However, inadvertent error, negligence, gross negligence or even ordinary malpractice do not violate the Eighth Amendment.  *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

To begin, plaintiff has not established that defendants Eplett, Blodgett or Yohr were even aware that he has EGPA, and thus, may have been especially vulnerable to complications from Covid-19.  At most, plaintiff argues that "medical staff clearly knew of my disease and its volatility," making them "responsible for informing security of my ailment."  (Dkt. #28 at 3.)  However, that assertion implies that defendants Eplett, Blodgett and Yohr were in fact *unaware*, and plaintiff offers no evidence suggesting that health care providers can even disclose an individual inmate's medical condition to non-medical staff without permission in these circumstances under applicable medical privacy laws, much less that plaintiff's medical providers did so.

Regardless, of these defendants, it is undisputed that:  (1) Warden Eplett alone decided to require inmates to quarantine in place, once she determined that the number of Covid-positive inmates exceeded the institution's available quarantine space; *and* (2) she was the only defendant who could have adopted a different policy allowing for greater inmate movement.  Certainly, neither Security Director Blodgett nor Unit Manager Yohr were empowered to move plaintiff over Warden Eplett's directive to restrict nonessential movement and quarantine inmates in place absent evidence that either knew of his serious medical need and the dangers of not acting to address it.  Even as to Dr. Gage, who obviously knew of plaintiff's EGPA diagnosis and could have recommended that plaintiff remain in the HSU for monitoring, plaintiff presents no evidence that he was aware

11

plaintiff contracted Covid before his EGPA follow-up appointment on January 20, 2021, let alone any evidence establishing that plaintiff experienced symptoms or complications that would have prompted Dr. Gage to order such monitoring.

Finally, with a population of approximately 666 inmates, plaintiff was obviously not the only one with an autoimmune disorder, much less moderate to severe asthma, heart or other pulmonary conditions, diabetes, obesity, advanced age, or other conditions making one vulnerable.  Further, at the time, plaintiff complained the number of active exposures had become so persuasive that no reasonable jury could find the Warden's decision to shelter in place amounted to deliberate indifference to plaintiff's condition, having only shown his disease was *rare*, not necessarily more vulnerable than in other high-risk groups. Finally, absent proof that a defendant *knew* plaintiff's condition put him at exceptional risk to others in a high-risk group, plaintiff cannot hold Blodgett, Yohr, and Gage liable for not trying to overcome the policy that their superior had adopted.  *See Miller v. Harbaugh*, 698 F.3d 956, 962 (7th Cir. 2012) ("defendants cannot be thought to be reckless if the remedial step was not within their power"); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job").  Accordingly, these defendants are also entitled to summary judgment in their favor.

As for Warden Eplett, plaintiff contends that her policy decision ignored the higher risk of serious harm from Covid-19 in particularly vulnerable groups.  Although the court takes judicial notice of the medical uncertainties as to the proper treatment and degree of risk from Covid exposure in December of 2020, the Covid-19 virus certainly represented

an objectively substantial risk of serious harm, especially to those in medically vulnerable subclasses of inmates.  Subjectively, however, "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause," *Farmer*, 511 U.S. at 846, especially in light of the "unique challenges for combatting the spread of COVID-19" in prisons, which after all were "*designed* to accommodate large and densely-packed populations." *Mays v. Dart*, 974 F.3d 810, 814 (7th Cir. 2020) (emphasis added).  That is why in part at least "[c]orrectional administrators must have 'substantial discretion' to devise reasonable solutions to the problems they face,' particularly when safety and security interests are at stake." *Id.* at 820 (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)).

Here, the evidence establishes beyond material dispute that Warden Eplett understood and was attempting to address the potential risk of serious harm to *all* inmates and staff at Oakhill by exposure to Covid-19, including those most vulnerable.  Moreover, plaintiff has fallen short of presenting evidence that would permit a reasonable trier of fact to find Eplett's attempts to mitigate that risk in December 2020 were *so* ineffective and unreasonable in light of the rapidly evolving circumstances of the pandemic's early days as to constitute deliberate indifference.  In particular, plaintiff presents no evidence contradicting Eplett's assumption that inmates who initially tested negative on December 14, including medically vulnerable inmates, still posed a risk of further spreading the virus because they had been exposed to Covid-positive inmates throughout the institution for three days before test results were reported.  *See id.* at 814 (noting that Covid-19 "transmits rapidly from person to person").

13

Confronting these circumstances, coupled with the lack of sufficient isolation space at Oakhill as cases quickly surged, a reasonable jury could not conclude based on plaintiff's own belief of the incorrectness of Eplett's decision that Eplett *intentionally disregarded* a known health and safety risk in imposing a quarantine-in-place requirement to limit inmates' exposure to each other as part of a larger set of mitigation strategies. *See Wilson v. Williams*, 961 F.3d 829, 840-44 (6th Cir. 2020) (BOP's array of responses to the risks posed by Covid-19 at a prison were reasonable) (collecting cases). On the contrary, the evidence shows that Eplett's decision to "isolate in place" was anchored in guidance from BHS and the TCS team, and that she loosened restrictions once positive case numbers finally began dropping.

While plaintiff would have required the preventative isolation of medically vulnerable inmates, prison officials need not take every possible step to address a serious risk of harm. *See Farmer*, 511 U.S. at 832 (prison official must take reasonable measures to guarantee inmate safety). Nor has plaintiff even attempted to demonstrate how such a provision would have been feasible under the dynamic circumstances that Warden Eplett faced, and thus, has failed to create a genuine dispute of material fact regarding the reasonableness of her efforts to address the known risk.

Nor does the fact that plaintiff's inmate complaint was "affirmed" tip the scales in his favor. Despite his suggestion to the contrary, neither the examiner, nor Warden Eplett on review, *conceded* that plaintiff should have been isolated in affirming the complaint. Instead, these reviewers concluded that protocols were followed, and explained why the all-unit quarantine was imposed. Moreover, the affirmance of an inmate complaint,

14

without more, does *not* establish a constitutional violation.  *See Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir. 1996) ("ignoring internal procedures does not mean that a constitutional violation has occurred"); *Yerks v. McArdle*, No. 19-cv-595-wmc, 2022 WL 741883, at *8 (W.D. Wis. March 11, 2022) (the affirmance of plaintiff's inmate complaint is "not a proxy for a constitutional violation").  Accordingly, Warden Eplett, too, is entitled to summary judgment in her favor.

Finally, even if a jury *could* reasonably find that Eplett's response was unreasonable, she is entitled to qualified immunity, a doctrine shielding government officials from civil liability, so long as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.  *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotation omitted).  A clearly established right is one sufficiently clear "that every reasonable official would have understood that what he is doing violates that right."  *Reichle v. Howards*, 566 U.S. 658, 664 (2012).  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  More specifically, once qualified immunity is raised by a defendant, plaintiff also bears the burden of showing that defendants violated a constitutional right that was clearly established at the time of the violation.  *Garcia v. Posewitz*, 79 F.4th 874, 879 (7th Cir. 2023).

Plaintiff has not and cannot meet his burden.  As explained above, he has not shown that Eplett violated his constitutional rights.  Further, neither has plaintiff presented, nor has can the court located, any decision of the Supreme Court or the Court of Appeals for the Seventh Circuit supporting a constitutional challenge to the failure to isolate vulnerable

Covid-19 inmates or to adopt quarantine protocols of which a reasonable person would have known in December 2020.  *Cf. Caines v. Akies*, No. 1:21-CV-1790-JPB-LTW, 2022 WL 20717441, at *3 (N.D. Ga. Mar. 17, 2022), report and recommendation adopted, No. 1:21-CV-1790-JPB, 2022 WL 20717397 (N.D. Ga. Sept. 14, 2022) (finding no cases from the Supreme Court, the Eleventh Circuit or the Georgia Supreme Court discussing Covid-19 policies that a jail would have known it was required to follow in December of 2020). Therefore, plaintiff's claim against Eplett is further barred by the doctrine of qualified immunity.

ORDER

IT IS ORDERED that:

1)  Defendants' motion for summary judgment (dkt. #19) is GRANTED.

2)  The clerk of court is directed to enter judgment in favor of defendants and to close this case.

Entered this 12th day of February, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

16